Filed 4/29/21  In re I.S. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re I.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>I.S.,<br><br>    Defendant and Appellant. | G058740<br><br>(Super. Ct. No. 17DL0773)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING; NO CHANGE IN JUDGMENT |

The opinion filed on April 1, 2021, is hereby modified as follows:

At the end of the first paragraph on page 22, a new passage is added that reads:

In a petition for rehearing, I.S. seeks to avoid forfeiture by claiming he in fact did object to "the admission of his post-*Miranda* statements on the ground that he did not understand his *Miranda* rights." (Fn. omitted.) In support, he points to the reporter's transcript of defense counsel's argument at the conclusion of the suppression motion hearing, where he asserted I.S. was "not *capable* of understanding a *Miranda* advisement." (Italics added.)

He now argues this incapacity comment, a topic never mentioned in his written motion to suppress, sufficiently preserved for review the more fully encompassing claim that he did not understand his *Miranda* rights "and knowingly, intelligently, and voluntarily waived them." He does not dispute that no *Miranda*-related arguments were raised in his written motion to suppress, let alone any suggestion he was intellectually incapable of understanding *Miranda*.

A defense motion to suppress solely predicated on voluntariness does not require the prosecutor to anticipate and address the unarticulated argument that a 13-year-old minor has no capacity to understand *Miranda* and that any waivers were thereby invalid. Indeed, the former question focuses on external police coercion, while the latter deals with an individual's internal mental states.

Moreover, when viewed in context, counsel's comment came after the evidentiary portion of the suppression motion hearing had concluded and the court was prepared to rule. The prosecutor had completed presenting his evidence responding to the grounds that *were* raised in the motion to suppress, and was never on notice to respond to this newly-minted incapacity remark. Indeed, in his final argument to the court, defense counsel acknowledged he was not suggesting "that anything was done inappropriate in terms of the *Miranda* advisement," but then went on to say, "the unique thing here . . . is just we have a 13-year-old boy who clearly is not capable of understanding a *Miranda* advisement." And that closing aside was his entire argument in support of the new ground for suppression.

To avoid forfeiture, I.S. was not only obligated to raise *specific grounds* for suppression, but to also do so in a *timely* fashion. (*Polk, supra,* 190 Cal.App.4th at p. 1194; see Evid. Code, § 353, subd. (a); cf. *People v. Demetrulias* (2006) 39 Cal.4th 1, 20 ["""[D]efendant's failure to make a *timely* and specific objection' on the ground asserted on appeal makes that ground not cognizable.""" (Italics added)]; see also *United States v. Olano* (1993) 507 U.S. 725, 731 ["'No procedural principle is more familiar to this Court than that a constitutional right,' or a right of any other sort, 'may be forfeited in criminal . . . cases by the failure to make *timely* assertion of the right before a tribunal having jurisdiction to determine it.'" (Italics added)].)

Had I.S. desired to raise intellectual incapacity as a ground for suppressing his statements, i.e., to contest the underlying validity of his *Miranda* waivers, he was obligated to do so in his motion to suppress, and not toss it in during his final postevidentiary hearing remarks. In these circumstances, the forfeiture doctrine applies.

2

Appellant's petition for rehearing is DENIED.  This modification does not change the judgment.

ARONSON, J.

WE CONCUR:

MOORE, ACTING P. J.

THOMPSON, J.

Filed 4/1/21  In re I.S. CA4/3 (unmodified opinion)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

|  |  |
|---|---|
| In re I.S., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>          v.<br><br> I.S.,<br><br>    Defendant and Appellant. | G058740<br><br>(Super. Ct. No. 17DL0773)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Douglas Hatchimonji, Judge.  Affirmed.

Robert F. Somers, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Daniel Rogers, Christopher Beesley, and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

*          *          *

A wardship petition (Welf. & Inst. Code, § 602) alleged I.S. murdered his mother and personally used a dangerous or deadly weapon in doing so. (Pen. Code. §§ 187, subd. (a); 12022, subd. (b)(1).)[1] After a contested jurisdictional hearing, the juvenile court found I.S. committed the lesser offense of voluntary manslaughter (§ 192, subd. (a)), and found the weapon use allegation true. It also determined clear and convincing evidence showed I.S. appreciated the wrongfulness of his conduct. (§ 26.) The court declared I.S. a ward of the juvenile court, and set the offense as a felony, with a maximum 12-year period of confinement, comprising 11 years for the manslaughter, plus 1 year for the enhancement.

I.S. contends the juvenile court erred in sustaining the wardship petition because the prosecution failed to prove beyond a reasonable doubt he did not act in self-defense. I.S. also argues the court erroneously denied his motion to compel the prosecutor to grant his father immunity for his testimony, which purportedly was "clearly exculpatory and essential" to his self-defense claim. Furthermore, the prosecutor's refusal to grant father immunity constituted reversible prosecutorial misconduct. Finally, he contends the court erred when it denied his motion to suppress some of the statements he made to police because they were involuntary and obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). We affirm.

I

FACTUAL BACKGROUND

Despite a jurisdictional hearing spanning five months, a reporter's transcript of 4,604 pages, 41 witnesses, and over 100 exhibits, the basic facts of this matter are neither disputed nor complicated, and we need not recite them in extensive detail. We summarize the facts in the light most favorable to the fact finder's

---

[1] All further undesignated statutory references are to the Penal Code.

determinations.  (*People v. Abilez* (2007) 41 Cal.4th 472, 504.)  We have included facts based in part on some of I.S.'s post-*Miranda* statements to police, the admissibility of which we discuss *post*.  Additional facts necessary to resolve the issues I.S. raises on appeal are discussed below.

On May 1, 2017, the district attorney filed two wardship petitions against 13-year-old I.S. (born August 2003).  One petition charged him with an April 28 residential burglary and with giving false information to a police officer; the other alleged a March 22 school burglary and vandalism.  While these two petitions were pending, on May 2 the juvenile court released I.S. to his mother's custody, subject to several conditions, including wearing a GPS enabled ankle monitor.

On the morning of May 3, during PE class, I.S. told his friend, Jesse S., "'I'm going to hurt my Mom,' or something like that."  Jesse did not ask I.S. to explain because he "didn't really believe him or really listen to him."

That afternoon, I.S.'s mother picked up I.S. after school.  They returned home and a while later I.S. and his mother argued about household chores.  I.S. claimed his mother had an "evil" look in her eyes, was yelling, and chasing him around the house.  At some point, I.S. went into the kitchen, pulled a knife with an eight-inch blade from the knife block, and returned with it to the living room.  He plunged the full length of the blade in an upward path into his mother's abdomen, withdrew the knife, and repeated the same thrust with the knife into his mother's abdomen.

I.S. returned to the kitchen, found a pair of scissors, and cut off his GPS monitor.  He fled out the back door into an alleyway, where he dropped the monitor into a trash can.  At a nearby cross-street, he discarded the knife into a planter area and buried it under dirt and debris.

Meanwhile, mother left the house through the front door.  She came out to the front sidewalk, profusely bleeding from her abdomen, and tried to wave down passing cars for help.  A deliveryman stopped, assisted her, and called 911.

Mother was lying in a pool of blood when police and paramedics arrived to render aid. She told a police officer and two paramedics that I.S. had stabbed her. She was taken to a nearby hospital where she died later that evening. The ER trauma surgeon described mother's injuries as the worst he had seen out of thousands of stab wounds.

Police officers found I.S. about a half mile from his home, behind an abandoned shopping center. Initially, I.S. lied about his name and age, but the officers eventually confirmed his identity and took him into custody.

That night, two detectives interviewed I.S. He admitted he stabbed his mother twice with a large kitchen knife during an argument over household chores. He also described verbal and physical abuse his mother had inflicted upon him in the past. I.S. said he felt fearful and threatened by his mother when he stabbed her, but could not specify her exact words or conduct that caused his fear or made him feel threatened. I.S. claimed that when he returned from the kitchen with the knife, his mother kept approaching him, and he had to use the knife to prevent her from hurting him. After he stabbed her, she screamed and ran out through the front door.

To support his self-defense claim, I.S. presented the testimony of relatives, some of I.S.'s acquaintances, and teachers and school staff, all of whom suggested an apparent history of physical and mental abuse inflicted on I.S. by his mother. They also described I.S. as normally nonviolent and nonaggressive. The witnesses described mother's volatile history of occasional violence with other family members, including with her ex-husband, I.S.'s father.

I.S. testified, and described instances where his mother physically and emotionally abused him. I.S. testified he had feared her for several months. On the day of the killing, she made him do chores after school. He described her as "acting unpredictable," and "a little more angry" than normal. After doing chores for about an hour, I.S. took a break, which angered his mother because she thought he had quit, and he

4

talked back to her in response.  She then started yelling at him to finish his chores and not to sit down. This upset him because he already had cleaned half the house.

I.S. could not remember exactly why tensions rose further, but as the situation escalated, his mother became more enraged and aggressive.  I.S. testified she then chased him through the house.  I.S. ran because he feared she was going to hit him and hurt him like she had in the past.  He insisted "[s]he had a look in her eyes, and it was just her vibe, like, it was not a good vibe."  He explained he had seen her look "evil" before, but never as much as on this occasion.  I.S., however, did not explain how he was able to obtain the knife while he was being chased around the house.

I.S. testified he vaguely recalled his mother trying to grab him to hit him. He got the knife because he was in fear, but insisted he did not plan to use it or to hurt her, and did not remember actually using the knife.  He testified he held out the knife to "show it" to her, but claimed she did not see it because "she was so mad, she wasn't thinking." [2]

When asked for more details, I.S. claimed he could not recall.  He also could not recall later demonstrating to detectives how he had used the knife to stab his mother.  But he insisted he did not see his mother "put her hands in front of her to try and stop what was happening."[3]

After the stabbing, I.S. admitted he cut off his ankle monitor and ran out of the house.  He was unsure what his mother was doing at this point and what was going to happen next. He put the monitor in a trash can in the alley behind his house and pushed the knife with his foot into the dirt at the end of the alley because he did not want to be

---

[2]    Several witnesses testified mother was "terrified of knives," and did not want to be around them when people were doing the dishes.  I.S. acknowledged he was aware of his mother's fear of knives.

[3]    The forensic pathologist found incised wounds on mother's left hip and the inside of her left wrist consistent with "defense-type" wounds.  Similarly, an experienced detective opined these two wounds were "a defense-type injury."

5

seen in public with it. He did not think he had seriously injured his mother because he did not think the knife had penetrated deeply. I.S. testified he loved his mother and just wanted her to stop hurting him and for their relationship to be good.

A defense expert concluded I.S.'s past experiences placed him in constant fear of physical abuse. Another expert opined a 13-year-old would stab someone threatening him more readily than an adult because he would experience threats more intensely, and would have less ability to control an impulse to immediately stop the threat. Another expert was permitted to testify that, in her opinion, I.S. acted in self-defense.

## II

### DISCUSSION

A. *Sufficiency of the Evidence Negating Self-Defense*

I.S. contends the prosecution failed to introduce sufficient evidence to prove he did not act in self-defense. He argues the evidence instead showed he "acted in self-defense against [mother] because he reasonably believed that he was in imminent danger of suffering great bodily injury or death from her" and "reasonably believed that the immediate use of deadly force was necessary to defend against this danger."

1. *Additional Factual Background*

At the time of the killing, I.S. was five feet eight inches tall, and weighed 160 pounds. Mother was five feet four inches tall, weighed 143 pounds, and was 48 years old.

I.S. told detectives he had an argument with his mother, but initially downplayed it as "nothing really serious," merely a miscommunication about housecleaning. A detective told I.S. they had spoken to his mother, and she said I.S. had cut her. When asked what he and his mother argued about, I.S. suggested the detective should ask I.S.'s sister, Brittney S., because mother also beat her.

6

I.S. claimed, "[A]t this point, I was protecting myself. I didn't know what to do. She was about to start hitting me and beating me. She's done this before and I haven't said anything . . . I was getting really scared and I – I did what I did. I couldn't do anything else. I was scared and felt threatened." When asked what mother was doing that made him feel threatened, I.S. replied, "Well, she gets – when she gets angry, she gets into a mode of like, 'I'm going to hurt you.' Like that. She herniated a disc in my back . . . almost a year ago."

Although the stabbing occurred in the living room, I.S. said he was able to run into the kitchen, get the knife, and come back to the living room, where "she was still coming toward me." Describing the stabbing, I.S. said, "So . . . she was still approaching me, even though I had the knife in my hand, so like I have to do this. There was no – I don't want to hurt – get hurt right now . . . [¶] . . . I had to do what I had to do. Like I just – I didn't want to get hurt again, like I did last time." "She – she came at me and I got her . . . [¶] . . . I stabbed her; yes."

I.S.'s testimony at the jurisdictional hearing was similar to what he told detectives during their interview. I.S. spoke with his father on the phone just before the stabbing, who told him to listen and obey his mother. But at this point I.S.'s memory became less than clear about the details of the stabbing. He explained, "[t]his is where it starts getting a little blurry. Kind of like, it's kind of like my memory starts skipping."

I.S. remembered at "[s]ome point having a knife," but now claimed he did not "recall grabbing it." Defense counsel asked, "[W]hat happened next," and I.S. replied "I don't even recall. . . . I recall there being blood," but "I didn't think it was that bad. I thought it was just like a little scrape or something like a little cut." When asked if, while he was running from mother, she was able to "get[] to you," I.S. claimed he did not know, explaining his next memory was running out the back door.

Later in his testimony, when asked again about the knife, I.S. stated, "I do not recall when I grabbed the knife. I do remember grabbing the knife because I was

7

scared. The initial reason for grabbing the knife wasn't to use [it], but more to – not even to use [it]. I wasn't even going to use it." But he still insisted he did not remember actually using the knife, or how many times he stabbed his mother.

On cross-examination, I.S. admitted on the day of the stabbing his mother had not physically harmed him, "[t]hat I can remember right now." He felt "like at some point she tried to grab me to like – like get me closer to hit me," but acknowledged he was not injured that day. When asked whether he had told police his mother had punched him three times in the face with a closed fist, he responded "I don't have an independent recollection of saying it." He admitted she did not threaten to kill or hurt him that day, but "body language-wise" she was threatening.[4]

On redirect examination, I.S. now remembered his mother once had threatened to kill him in the past, although he could not remember any details. He also now recalled she had thrust a scissor at him and inflicted a cut when he blocked it with his hand. He admitted he never mentioned these incidents before, either in his direct examination, his statements to police, or in multiple pretrial interviews with the defense experts.

When asked about his interview with the detectives, in which he admitted to stabbing his mother and telling them "just take me to Juvenile Hall" because "I stabbed my mom and I deserve it," and after seeing a transcript of that interview, I.S. claimed not to recall discussing that during the interview.

In a lengthy and reasoned "Statement of Decision," the juvenile court concluded I.S. committed the lesser offense of voluntary manslaughter. It also specifically found that "self-defense was disproved beyond a reasonable doubt."

---

[4] The court took an overnight recess at this point in the prosecutor's cross-examination. During the night, I.S. escaped from Juvenile Hall. He was apprehended the next day, but the jurisdictional hearing did not recommence until almost a month later.

8

In explaining its rulings, the juvenile court found "substantial evidence" showed I.S. "act[ed] under the influence of intense emotion obscuring his reasoning and judgment." Furthermore, mother's "provocation, in the form of verbal and physical abuse, would cause an average adolescent to act rashly and without due deliberation."

Addressing self-defense, the court further found "there is no basis to find that [I.S.] *reasonably* believed he was in imminent danger of suffering great bodily injury or that he *reasonably* believed deadly force was necessary [citation]; that is whether a reasonable person in a similar situation would have believed deadly force was necessary." (Original italics.) The court "discount[ed] [I.S.'s] credibility," but "even if his trial testimony were given full weight, at best, it establishes that he subjectively believed he was in danger and needed to defend himself." The court, however, concluded there was "no basis" to show I.S.'s "subjective belief was objectively reasonable."

2. *Standard of Review*

"The same standard governs review of the sufficiency of evidence in adult criminal cases and juvenile cases: we review the whole record in the light most favorable to the judgment to decide whether substantial evidence supports the conviction, so that a reasonable fact finder could find guilt beyond a reasonable doubt." (*In re Matthew A.* (2008) 165 Cal.App.4th 537, 540; see also *In re V.V.* (2011) 51 Cal.4th 1020, 1026.) Under this standard, the critical inquiry is "whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*Jackson v. Virginia* (1979) 443 U.S. 307, 318-319.)

We do not reweigh the evidence, or resolve factual conflicts, which are functions reserved for the trier of fact. (*In re Ryan N.* (2001) 92 Cal.App.4th 1359, 1372.) "Moreover, we must be ever mindful of the fact that it is the exclusive province of the trier of fact to determine the credibility of a witness and the truth or falsity of the

9

facts upon which a determination depends." (*Ibid.*) "Thus, in an appeal from a juvenile criminal as in any other criminal appeal, we are in no position to weigh any conflicts or disputes in the evidence. The juvenile trial court was the trier of fact and the sole judge of the credibility of witnesses; we are not. Even if different inferences can reasonably be drawn from the evidence, we cannot substitute our own inferences or deductions for those of the trial court. . . . In short, in juvenile cases, as in other areas of the law the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination of whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, which will support the decision of the trier of fact." (*Id.* at p. 1373.)

Moreover, "[i]ssues arising out of self-defense, including whether the circumstances would cause a reasonable person to perceive the necessity of defense, whether the defendant actually acted out of defense of himself, and whether the force used was excessive, are normally questions of fact for the trier of fact to resolve." (*People v. Clark* (1982) 130 Cal.App.3d 371, 378, disapproved on another ground in *People v. Blakely* (2000) 23 Cal.4th 82, 92.) Here, we must defer to the trier of fact and its fact-intensive determination on the objective reasonableness of I.S.'s reaction to the fear and threat he allegedly perceived. (See *People v. Nguyen* (2015) 61 Cal.4th 1015, 1044 [""'where some of the evidence tends to show a situation in which a killing may not be justified then the issue is a question of fact for the [fact finder] to determine"'"].)

3. *Legal Background: Self-Defense*

"Homicide, the killing of one human being by another, is not always criminal. In certain circumstances, a killing may be excusable or justifiable. [Citations.] Murder and manslaughter are the forms of criminal homicide. 'Murder is the unlawful killing of a human being . . . with malice aforethought.' [Citation.]" (*People v. Elmore* (2014) 59 Cal.4th 121, 132 (*Elmore*).) "By contrast, 'Manslaughter is the unlawful killing of a human being *without* malice.' [Citation.] 'The vice is the element of malice;

10

in its absence the level of guilt must decline.'" (*In re Christian S.* (1994) 7 Cal.4th 768, 773 (*Christian S.*).)

"Actual," or "perfect," self-defense, which is "based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime." (*Elmore, supra,* 59 Cal.4th at pp. 133-134; see § 197, subd. 3.) Mere fear is not enough to establish perfect self-defense, however. (See § 198 ["A bare fear . . . is not sufficient to justify" a homicide].) Rather, "the circumstances must be sufficient to excite the fears of a reasonable person, and the party killing must have acted under the influence of such fears alone." (*Ibid.*) Moreover, "'"[t]he peril must appear to the defendant as immediate and present and not prospective or even in the near future."'" (*People v. Manriquez* (2005) 37 Cal.4th 547, 581 (*Manriquez*).)

"A killing committed when that belief is *unreasonable* is not justifiable. Nevertheless, 'one who holds an honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury does not harbor malice and commits no greater offense than manslaughter.' [Citation.] . . . [T]his mental state . . . is most accurately characterized as an actual but unreasonable belief." (*Elmore, supra,* 59 Cal.4th at pp. 133-134; cf. *Manriquez, supra*, 37 Cal.4th at p. 581 ["'imperfect self-defense is not an affirmative defense, but a description of one type of voluntary manslaughter'"]; *Christian S., supra,* 7 Cal.4th at p. 771 ["when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant . . . can be convicted of no crime greater than voluntary manslaughter"].)

4. *Analysis*

The question before us is whether substantial evidence supports the juvenile court's conclusion it was objectively unreasonable for I.S. to believe the immediate use of deadly force was necessary because he was in imminent danger of suffering great

11

bodily injury or death. We conclude substantial evidence supports the juvenile court's decision.

Notably, as the court observed, I.S.'s testimony, like his statements to police, did not show exactly what mother "did or said to make [I.S.] scared" other than "saying 'she was still coming towards me'" and that she had hurt him in the past. I.S. insisted his mother "had a look in her eyes," a bad "vibe," and looked "evil," explaining he had seen this "evil" look before, but never as much as on this occasion. Even so, I.S. admitted mother did not touch him, she had no weapon, and she did not verbally threaten to kill or severely injure him; she only seemed threatening "body language-wise." This was at odds with what I.S. initially told detectives about the argument, in which he downplayed its seriousness as a mere "miscommunication" over housecleaning chores: "We had a little bit of an argument. It was just over cleaning though. . . . Nothing big."

Both in his statements to police and his testimony, I.S. failed to explain the actual nature of the threat he perceived. At best, he said he vaguely feared for what mother *might* do, but never that she was about to kill him or cause him great bodily injury. He claimed he stabbed his mother to protect himself because he believed she "was about to start hitting [him] and beating [him]" because she had done it before, but he based this nebulous fear on her face and eyes, not her actions or words. Without more, mother's mere visage does not reasonably point to the need for a peremptory use of lethal force.

Substantial evidence supported the juvenile court's conclusion I.S. lacked an objective basis to believe I.S.'s mother posed the threat of death or great bodily injury undermines I.S.'s perfect self-defense argument. Consequently, the absence of evidence showing an imminent threat shows that I.S.'s subjective belief on the necessity of lethal force was objectively unreasonable under these circumstances.

I.S. argues we should reject the juvenile court's findings and instead find his beliefs and resulting actions were reasonable, and his use of lethal force was

12

appropriate in these circumstances. His argument essentially asks us to reweigh the evidence, which we cannot do. Where "'the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; *People v. Brown* (1984) 150 Cal.App.3d 968, 979 ["It is of no consequence that the [fact finder's] believing other evidence, or drawing different inferences, might have reached a contrary conclusion"]; cf. *People v. Mora and Rangel* (2018) 5 Cal.5th 442, 490 ["Whether a reasonable trier of fact could reach a different conclusion based upon the same facts does not mean the verdict is not supported by sufficient evidence"].)

"A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"'" the fact finder's conclusions. (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.) Given our limited role, I.S. "bears an enormous burden" to prevail on a sufficiency of the evidence claim. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.) Substantial evidence supports the juvenile court's factual and legal determinations that I.S. killed his mother in an actual, but unreasonable, belief that lethal self-defense was necessary. We therefore find no basis to overturn the voluntary manslaughter finding.

B. *Testimonial Immunity for I.S.'s Father*

I.S. next claims the juvenile court erred in denying his request to order the prosecutor to grant use immunity to I.S.'s father for his "clearly exculpatory and essential" testimony, which supposedly would have supported a perfect self-defense claim. He argues his father was the last person to speak to I.S. and his mother before the killing, and he could have described their demeanor about 40 minutes beforehand. In addition, father could have provided information regarding mother's abusive conduct toward *father* during their 25-year relationship.

I.S. further contends the prosecutor's refusal to grant his father immunity was prosecutorial misconduct because the prosecutor "us[ed] deceptive and reprehensible methods to persuade the juvenile court." I.S. argues we should reverse the judgment, remand for a new trial, and order the prosecution to either grant use immunity to his father for his testimony or "have [I.S.] acquitted."

1. *Additional Factual Background*

Before I.S.'s defense case began, his counsel requested the juvenile court grant immunity—or order the prosecutor to grant immunity—to I.S.'s father because the father intended to invoke his Fifth Amendment right against self-incrimination if called and questioned as a witness.[5] The prosecutor earlier had refused to grant father immunity.

I.S.'s proffer of what father would testify to included a phone conversation he had with mother and I.S. about 40 minutes before the stabbing, where father would say mother and I.S. were arguing about chores. Purportedly at mother's request, father told I.S. to listen and obey his mother. I.S.'s father would testify he thought I.S. was listening to his advice and not upset about the argument, but mother was "really upset" at I.S. Father also would testify about mother's conduct in the past year; how he and I.S. had been bonding in the month before the stabbing; and describe mother and father's efforts to find I.S. after he ran away from home. He also would testify about mother's alleged drug use and that she could become violent and upset when using drugs; about father's and mother's past verbal and physical fights; and about father's interactions with mother and I.S. in the days before the stabbing.

The juvenile court first pointed out it could not itself grant immunity to a defense witness, citing *People v. Masters* (2016) 62 Cal.4th 1019 (*Masters*). As for

---

[5]    Other than giving his name, and identifying I.S. as his son and I.S.'s mother as his ex-wife whom he had known for 25 years, father invoked his Fifth Amendment privilege against self-incrimination and refused to answer defense counsel's questions.

14

ordering the prosecutor to grant immunity, the court found it could do so only if the prosecutor's decision to withhold immunity rose to the level of prosecutorial misconduct, citing *Masters* and *People v. Hull* (2019) 31 Cal.App.5th 1003.

The juvenile court denied I.S.'s motion to compel the prosecutor to grant immunity. In explaining its ruling, the court observed: "[I]t's not sufficient that the proffered evidence is exculpatory. It has to be more than that. It has to be clearly exculpatory. [¶] It's not a question of whether or not the prosecution is sequestering the truth. It's whether the prosecution is sequestering clearly exculpatory evidence. That's what pushes . . . the case into prosecutorial misconduct. . . . [¶] . . . There has to be a showing of a deliberate intention on the part of the prosecutor to distort the factfinding process."

The juvenile court found father's proffered testimony would not be clearly exculpatory because it would only assist the court in determining mother's character, and "who [mother] was doesn't tell me in a clear way what happened in the moments before the homicide occurred." Thus, the court "found that the [proffered evidence] is not clearly exculpatory . . . that [father's] testimony is not essential . . . and that based upon that, the motion is denied."

2. *Legal Background*

In *Masters, supra,* 62 Cal.4th 1019, our Supreme Court held that "California courts have no authority to confer [judicial] use immunity on witnesses." (*Id.* at p. 1051.) Instead, "'the power to confer immunity is granted by statute to the executive.'" (*Id.* at pp. 1050-1051.) Consequently, the juvenile court correctly denied I.S.'s request for *judicial* immunity for I.S.'s father.

"[P]rosecutors are not under a general obligation to provide immunity to witnesses in order to assist a defendant." (*People v. Williams* (2008) 43 Cal.4th 584, 622; see *People v. Samuels* (2005) 36 Cal.4th 96, 127-128 (*Samuels*) [prosecutor did not commit misconduct by not granting immunity to a nonessential defense witness who

15

asserted her right against self-incrimination and refused to testify].)  Even so, the *Masters* court recognized that, in certain circumstances, "due process may compel a defense witness to be immunized."  (*Masters, supra,* 62 Cal.4th at p. 1051.)

"If a defendant can show that the prosecutor refused to grant immunity "'with the deliberate intention of distorting the judicial factfinding process,'" a retrial is necessary."  (*Masters, supra,* 62 Cal.4th at p. 1051.)  Thus, to establish a due process violation, the defendant must demonstrate all of the following: the prosecutor's refusal to grant immunity was deliberately designed to distort the factfinding process; it resulted in the loss of testimony that was ""'"clearly exculpatory"'"" and ""'"essential"'"" to the defense; and there are ""'"no strong governmental interests which countervail against a grant of immunity."'""  (*Id*. at pp. 1051-1052, citing *United States v. Quinn* (3rd Cir. 2013) 728 F.3d 243, 251 (en banc) (*Quinn*).)[6]

On appeal, we apply the traditional prosecutorial misconduct test:  "'"When a prosecutor's intemperate behavior is sufficiently egregious that it infects the trial with such a degree of unfairness as to render the subsequent conviction a denial of due process, the federal Constitution is violated.  Prosecutorial misconduct that falls short of rendering the trial fundamentally unfair may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.'"  (*Masters, supra,* 62 Cal.4th at p. 1052.)  We review de novo whether prosecutorial misconduct violated a defendant's due process rights.  (*People v. Uribe* (2011) 199 Cal.App.4th 836, 860 (*Uribe*).)

### 3. *Analysis*

In general, statements or threats that interfere with a defendant's compulsory process right to call witnesses amount to prosecutorial misconduct.  (*People*

---

[6]     The *Masters* court *assumed*, but did not hold, that the factors outlined in *Quinn* "state the appropriate test for evaluating a constitutional claim arising from the denial of witness immunity. . . ."  (*Masters, supra,* 62 Cal.4th at p. 1052.)

*v. Treadway* (2010) 182 Cal.App.4th 562, 568.) That is not the case her, however, because there is no indication in the record the prosecutor said anything to the father suggesting he would be prosecuted for any crimes he revealed in the course of his testimony, or that the prosecutor threatened the father with a perjury prosecution. (*Ibid*.) Nor is there any suggestion the prosecutor advised I.S.'s father not to testify or told the father his testimony would not be immunized. (*Id*. at p. 569.)

The record also belies I.S.'s contention the prosecutor's refusal to grant immunity violated due process because I.S.'s father would have provided "clearly exculpatory" testimony that was "essential" to his defense. Father was not a neutral witness; he had an obvious natural motive to protect his son. (See *Quinn, supra*, 728 F.3d at p. 263 [defense witness's familial connection to defendant undermined claim that witness's proposed testimony required the government to grant immunity because the testimony would have been clearly exculpatory].) Moreover, as the juvenile court aptly noted, father's proffered testimony would not have revealed anything about what actually happened after I.S. retrieved the knife from the kitchen and returned to face his mother; in other words, it was not *clearly* exculpatory.

Nor would father's testimony have been "essential." The juvenile court heard extensive testimony from I.S., other family members, expert witnesses, and several others both in support of his self-defense claim and to describe mother's character. And, as the court further observed, father would not have been able to shed any additional light on how the argument escalated and the stabbing ultimately occurred.

I.S. argues father could "corroborate" I.S.'s and other witnesses' testimony regarding mother's violent propensity and her mood just before she was killed. Corroborative evidence is generally not considered essential, however. (See, e.g., *United States v. Whiteford* (3rd Cir. 2012) 676 F.3d 348, 363-364 ["Testimony that is 'ambiguous . . . cumulative, or . . . found to relate only to the credibility of the government's witnesses' is not clearly exculpatory"]; cf. *Samuels, supra,* 36 Cal.4th at

17

pp. 127-128 [cumulative evidence is not essential].) And when, as here, the source of the corroborative evidence has a close personal relationship with the accused, the importance of that corroborative evidence is further diminished. We conclude father was not such an important witness for the defense that the prosecutor's failure to grant him immunity infringed I.S.'s fair trial rights.

Furthermore, we find nothing in the record showing the prosecutor's "'intemperate behavior . . . sufficiently egregious that it infect[ed] the trial with such a degree of unfairness as to render the subsequent [juvenile court findings] a denial of due process,'" nor any use by the prosecutor of "'deceptive or reprehensible methods to persuade the [juvenile] court. . . .'" (*Masters, supra*, 62 Cal.4th at p. 1052.) The prosecutor explained that he was "not intending to distort the factfinding process," but rather, when comparing father's criminal history and major credibility issues, along with the minimal probative value of father's proffered testimony, he "does not believe that there's anything justifying the granting of immunity."

I.S. bore the burden of showing "the prosecutor refused to grant immunity "'with the deliberate intention of distorting the factfinding process."'" (*Masters, supra*, 62 Cal.4th at p. 1051.) Here, I.S. fails to make this showing either below or in this court. Thus, I.S. has failed to establish that "'the prosecutor intentionally refused to grant immunity to a key defense witness for the purpose of suppressing essential, noncumulative exculpatory evidence,' thereby distorting the judicial factfinding process." (*People v. Stewart* (2004) 33 Cal.4th 425, 470.) Similarly, I.S. did not rebut the prosecutor's reasons for not offering immunity and, therefore, "failed to show there was no countervailing governmental interest against granting immunity" to father. (*Masters, supra*, 62 Cal.4th at p. 1053.)

In sum, "we cannot characterize the prosecutor's decision not to grant immunity to [father] as egregious, unfair, deceptive, or reprehensible. The prosecutor's decision was not misconduct." (*Masters, supra,* 62 Cal.4th at p. 1053.) Consequently,

the juvenile court did not err in denying I.S.'s request to order the prosecutor to grant father use immunity.[7]

## C. *Admissibility of I.S.'s Post-*Miranda *Statements*

Lastly, I.S. contends the juvenile court erred on two interrelated grounds by denying his motion to suppress his post-*Miranda* statements to police. First, he argues the prosecutor failed to show I.S. understood and knowingly waived his *Miranda* rights. Second, he claims the coercive circumstances of his detention rendered his statements involuntary.

### 1. *Additional Factual Background*

About 6:30 p.m., uniformed officers detained I.S. behind the shopping center, handcuffed him and placed him in the back of a patrol car. Corporal Aaron Nelson asked I.S., "Do you mind going with me to the police department?" I.S. agreed to do so. Nelson brought I.S. to the Juvenile Justice Center, where Nelson stayed with him for about two and a half-hours while the investigation developed. I.S. was seated in a chair in a "bullpen" multi-desk open office area, which was empty because the normal everyday staff had left for the day. I.S. had one handcuff placed loosely around his wrist and the other cuff was attached to the chair.

After Detective Richard Desbiens learned I.S.'s mother had died, he told Nelson to formally arrest I.S. and advise him of his *Miranda* rights. And about 9:00 p.m.,

---

[7]     For the first time on appeal, I.S. argues the juvenile court abused its discretion by refusing to specifically rule on whether there was prosecutorial misconduct, having found only that father's testimony was neither clearly exculpatory nor essential and denying the motion to compel immunity on those grounds alone. He claims the court's "failure to rule on prosecutorial misconduct caused the court not to compel the prosecution to immunize [father], which was an error," and reversal is required. But it was the *prosecutor*, not defense counsel, who asked the court to rule on the misconduct issue. Thus, we find the claim forfeited. And in any event, we review rulings on claims of prosecutorial misconduct de novo, and not for an abuse of discretion. (*Uribe, supra,* 199 Cal.App.4th at p. 860.)

Nelson arrested I.S. for aggravated assault,[8] and read him his *Miranda* rights from a standard prebooking form. When Nelson asked whether he understood those rights, I.S. stated he did. I.S. did not request to speak to an attorney or tell Nelson he did not want to speak. Nelson testified that during the entire two and a half-hours he spent with I.S. he had no concerns about I.S.'s ability to comprehend and respond to questions. At no time did Nelson "display [his] weapon" to I.S., or threaten him in any way. On at least two occasions, I.S. asked if he could call his mother, but Nelson told him, "Not right now."

After the *Miranda* advisement, two detectives interviewed I.S. about 10:00 p.m. that night. The interview took place in an interview room at the police station. He was no longer handcuffed. The interview lasted about an hour and five minutes.

Detective Desbiens began the interview by introducing himself, and telling I.S., "And I know Officer Nelson had already told you that you're under arrest?" I.S. replied, "Right." He asked I.S., "And [Nelson] read you your *Miranda* rights?" to which I.S. nodded affirmatively. He asked, "And do you understand what those were?" to which I.S. again nodded that he did. Desbiens testified neither he nor his partner, Detective Farley, threatened I.S. in any way.[9] During the interview, the officers provided I.S. food and drink at his request.

The detectives were aware of I.S.'s age. I.S. told them he took Abilify for ADHD and was afflicted with "lower autism." Desbiens and I.S. discussed how those issues "exhibit[] and affect[] him." Desbiens also took this information "into account in conducting the rest of the interview," because based on his 27 years of experience, "different suspects require different approaches when it comes to interviewing."

I.S. brought a motion to suppress all his statements to police, arguing he "was interrogated by police for approximately two hours," and "[t]he statement was not

---

[8]    Nelson was not told I.S.'s mother had died at 8:12 p.m. Neither was I.S.
[9]    The entire interview was videotaped and played for the court during the jurisdictional hearing.

20

voluntary and should be excluded." In his motion, I.S. did not challenge the adequacy of the *Miranda* advisement or his understanding of his rights, and did not claim he had invoked them; he challenged only the voluntariness of his statements.

The juvenile court granted I.S.'s motion to suppress the pre-*Miranda* statements he made after he was handcuffed and placed in the patrol car, finding a "technical" *Miranda* violation.[10] The court, however, found those statements were neither coerced nor involuntary, and ruled the prosecutor could use them for impeachment purposes. (See *People v. Hoyt* (2020) 8 Cal.5th 892, 936; see also *Harris v. New York* (1971) 401 U.S. 222, 225-226.)

As for I.S.'s post-*Miranda* statements, the juvenile court found the prosecutor met his burden of showing I.S. was advised of and understood his rights. After viewing the videotape of the interview and discussing the relevant circumstances, the court also found I.S. voluntarily waived his *Miranda* rights, and his statements were voluntary.

2. *Analysis*

a. *Miranda*

I.S. first argues the prosecutor failed to prove he understood and knowingly, intelligently, and voluntarily waived his Fifth Amendment rights. However, "unless a defendant asserts in the trial court a specific ground for suppression of his or her statements to police under *Miranda*, that ground is forfeited on appeal, even if the defendant asserted other arguments under the same decision." (*People v. Polk* (2010) 190 Cal.App.4th 1183, 1194 (*Polk*).) As noted, I.S. in the juvenile court did not challenge the adequacy of his *Miranda* advisement or claim he did not understand his rights. His sole claim below rested on the voluntariness of his statements.

---

[10] During I.S.'s initial detention in the field, officers informally questioned but did not advise I.S. of his *Miranda* rights. The juvenile court found I.S. was in custody when he was placed in the back of the patrol car in handcuffs, and suppressed those statements.

I.S.'s motion to suppress based on involuntariness was "simply not sufficient to preserve the [*Miranda*] issue . . . because [it] did not call to the attention of the trial court the substantive inadequacy of the warnings under *Miranda* and provide the trial court an opportunity to avoid error on that ground." (*Polk, supra,* 190 Cal.App.4th at pp. 1194-1195.) Consequently, I.S. has forfeited his *Miranda* claims on appeal because he did not raise the issue in the juvenile court. (*Id.* at p. 1194; see *People v. Linton* (2013) 56 Cal.4th 1146, 1166 (*Linton*) [forfeiture by failing to raise a "custod[y]" issue for *Miranda* purposes]; cf. *People v. Cruz* (2008) 44 Cal.4th 636, 669 (*Cruz*) [voluntariness claim forfeited by only objecting on *Miranda* grounds in the trial court].)

But even assuming the issue was not forfeited, we find I.S.'s *Miranda* claim also fails on the merits.

Like adults, juveniles may validly waive their *Miranda* rights. (*People v. Jones* (2017) 7 Cal.App.5th 787, 809; *People v. Lewis* (2001) 26 Cal.4th 334, 384 [paranoid schizophrenic 13-year-old understood and waived his *Miranda* rights]; *In re Charles P.* (1982) 134 Cal.App.3d 768, 772 [valid waiver from a 12-year-old with prior juvenile court experience]; *In re Brian W.* (1981) 125 Cal.App.3d 590, 602-603 [15 year-old-with an IQ of 81 validly waived his *Miranda* rights].) Juveniles also may impliedly waive their *Miranda* rights. (*People v. Lessie* (2010) 47 Cal.4th 1152, 1169 (*Lessie*).) An implied waiver occurs when, after being apprised of his rights, a minor "willingly answer[s] questions after acknowledging that he understood those rights." (*Ibid.*; *Cruz, supra,* 44 Cal.4th at p. 667.)

On review of a trial court's ruling on a claimed *Miranda* violation, "'we accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if supported by substantial evidence. We independently determine from [those facts] whether the challenged statement was illegally obtained.'" (*People v. Gamache* (2010) 48 Cal.4th 347, 385; *People v. Delgado* (2018) 27 Cal.App.5th 1092, 1104 (*Delgado*).) In doing so, we give great weight to the considered conclusions of a

22

lower court that previously has reviewed the same evidence. (*People v. Whitson* (1998) 17 Cal.4th 229, 248.)

"To establish a valid waiver of *Miranda* rights, the prosecution must show by a preponderance of the evidence that the waiver was knowing, intelligent, and voluntary." (*People v. Nelson* (2012) 53 Cal.4th 367, 374-375 (*Nelson*); *Colorado v. Connelly* (1986) 479 U.S. 157, 168 [same].) "Determining the validity of a *Miranda* rights waiver requires 'an evaluation of the defendant's state of mind' [citation] and 'inquiry into all the circumstances surrounding the interrogation' [citation]." (*Nelson, supra,* 53 Cal.4th at p. 375.) Factors to consider include "'the juvenile's age, experience, education, background, and intelligence, and . . . whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and consequences of waiving those rights.' [Citations.]" (*Ibid.*) "This approach allows the necessary flexibility for courts 'to take into account those special concerns that are present when young persons, often with limited experience and education and with immature judgment, are involved.' [Citation.]" (*Id.* at p. 379.)

"[T]here is no presumption that a minor is incapable of a knowing, intelligent waiver of his rights." (*In re Eduardo G.* (1980) 108 Cal.App.3d 745, 756.) ""'Neither a low I.Q. nor any particular age of minority is a proper basis to assume lack of understanding, incompetency, or other inability to voluntarily waive the right to remain silent under some presumption that the *Miranda* explanation was not understood.'""" (*Lewis, supra,* 26 Cal.4th at p. 384.)

The juvenile court's finding officers questioned I.S. without a proper *Miranda* advisement does not necessitate suppression of his post-*Miranda* statements at the police station. "Case law makes clear that an initial *Miranda* violation does not necessarily require the exclusion of statements following proper advisements. Indeed, we have explained, '[e]ven when a first statement is taken in the absence of proper advisements and is *incriminating*,' a subsequent voluntary confession made after proper

23

advisements 'is not tainted simply because it was procured after a *Miranda* violation.' [Citation.] '"The relevant inquiry"' is whether the statement was '"voluntarily made"' following proper warnings." (*People v. Young* (2019) 7 Cal.5th 905, 924; see also *Oregon v. Elstad* (1985) 470 U.S. 298, 318.)

Here, I.S. was 13 years and 9 months old. However, this was not his first experience with the criminal justice system, as he already was facing two separate allegations of felonious criminal conduct for which he had been released from custody just the day before the killing. He responded appropriately to Nelson's initial inquiries and Desbiens's reminders, and his demeanor throughout the interview suggests he was fully aware of what was transpiring. Nothing suggests I.S. lacked an understanding of or was confused about the meaning of the *Miranda* advisement and his rights. His cogent, and often evasive, responses during the interview itself also support the juvenile court's conclusion I.S. was fully capable of understanding the *Miranda* warnings, the nature of the rights at stake, and the consequences of waiving those rights.

Nelson testified he informed I.S. of each of his *Miranda* rights from a standard advisal form, and I.S. stated he understood each of those rights. Nothing in the record indicates he had any confusion on these points. The defense offered nothing to rebut the prosecutor's showing of compliance with *Miranda*. I.S.'s youth and purported learning disabilities did not preclude him from making a knowing, voluntary, and intelligent waiver. (See *Lewis, supra*, 26 Cal.4th at p. 384.)

"In consideration of the totality of circumstances surrounding the interrogation, we find [I.S.'s] responses to [Nelson's] inquiries reciting his *Miranda* rights reflect a knowing and intelligent understanding of those rights, and that [I.S.'s] willingness to answer questions after expressly affirming on the record his understanding of each of those rights constituted a valid implied waiver of them. [Citations.] . . . '[T]he record is devoid of any suggestion that the police resorted to physical or psychological pressure to elicit statements from [I.S.]. To the contrary, [I.S.'s] willingness to speak with

24

the officers is readily apparent from his responses. He was not worn down by improper interrogation tactics, lengthy questioning, or trickery or deceit.' [Citation.]" (*Cruz, supra,* 44 Cal.4th at pp. 668-669; see also *Fare v. Michael C.* (1979) 442 U.S. 707, 726-727.)

Thus, forfeiture notwithstanding, and considering the totality of the circumstances, we conclude the prosecutor met his burden to show I.S. was fully advised of and voluntarily, intelligently, and knowingly waived his *Miranda* rights.

b. *Voluntariness*

"The use of an involuntary confession in a delinquency proceeding violates a minor's Fourteenth Amendment rights." (*In re Anthony L.* (2019) 43 Cal.App.5th 438, 452 (*In re Anthony L.*). Whether a confession is voluntary presents "'a mixed question of law and fact that is nevertheless predominantly legal . . . .' [Citation.] Hence, '"[o]n appeal, the determination of a trial court as to the ultimate issue of the voluntariness of a confession is reviewed independently . . . . [¶] . . . However, "the trial court's findings as to the circumstances surrounding the confession—including 'the characteristics of the accused and the details of the interrogation' [citation]—are clearly subject to review for substantial evidence. . . .'" [Citation.]" (*People v. Jones* (1998) 17 Cal.4th 279, 296.)

Thus, "'[w]here the voluntariness of a confession is raised on appeal, the reviewing court should examine the uncontradicted facts to determine independently whether the trial court's conclusion of voluntariness was proper. If conflicting testimony exists, the court must accept that version of events that is most favorable to the [prosecution] to the extent it is supported by the record.' [¶] '"[T]he question in each case is whether the defendant's will was overborne at the time he confessed. 'The burden is on the prosecution to show by a preponderance of the evidence that the statement was voluntary. [Citation.]'"'" (*Delgado, supra*, 27 Cal.App.5th at p. 1107; see also *Lego v. Twomey* (1972) 404 U.S. 477, 489 [preponderance burden].)

25

"We consider statements involuntary—and thus subject to exclusion under the Fifth and Fourteenth Amendments of the federal Constitution—if they are the product of 'coercive police conduct.' [Citation.] We evaluate this question by looking to the totality of the circumstances to determine 'whether the defendant's "'will has been overborne and his capacity for self-determination critically impaired'" by coercion.' [Citation.] The presence of police coercion is a necessary, but not always sufficient, element. [Citation.] We also consider other factors, such as the location of the interrogation, the interrogation's continuity, as well as the defendant's maturity, education, physical condition, and mental health. [Citation.]" (*People v. Caro* (2019) 7 Cal.5th 463, 492.)

"While a determination that a confession was involuntary requires a finding of coercive police conduct [citations], '"'the exertion of any improper influence'"' by the police suffices." (*In re Elias V.* (2015) 237 Cal.App.4th 568, 577.) Simply put, the test for determining whether a confession is voluntary is whether the defendant's "will was overborne at the time he confessed." (*Lynumn v. Illinois* (1963) 372 U.S. 528, 534.)

"A confession may be found involuntary if extracted by threats or violence, obtained by direct or implied promises, or secured by the exertion of improper influence." (*People v. McWhorter* (2009) 47 Cal.4th 318, 347.) Here, there was no violence or threats directed at I.S. by Nelson or the detectives. Similarly, there were no promises made, direct or implied, and no improper influence exerted.

I.S. suggests Nelson used an improper or coercive interrogation technique when he urged I.S. to "tell the truth." There is nothing coercive in "officers urging defendant to tell the truth and informing defendant of the obvious point that the sooner he told the truth, the sooner the interview would finish." (*Linton, supra,* 56 Cal.4th at p. 1195; see *People v. Holloway* (2004) 33 Cal.4th 96, 115 ["'mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary'"];

*People v. Williams* (2010) 49 Cal.4th 405, 444 [same]; cf. *People v. Ray* (1996) 13 Cal.4th 313, 340 ["[O]nly those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable" are prohibited].)

I.S. selectively quotes from *Gallegos v. Colorado* (1962) 370 U.S. 49, 54 (*Gallegos*), and asserts, "'[A] 14-year-old boy, no matter how sophisticated, . . . [¶] would have no way of knowing . . . the consequences of his confession . . .' without advice on his rights from a mature person looking out for the minor's interests." However, the Supreme Court did not create a bright-line rule that a 14 year old cannot make a voluntary statement absent a "mature person's" assistance. The juvenile suspect in *Gallegos v. Colorado* had been subjected to a "*five-day* detention—during which time the boy's mother unsuccessfully tried to see him and he was cut off from contact with any lawyer or adult advisor. . . ." (*Gallegos, supra,* at p. 54, italics added.) Those circumstances, more than merely the minor's age, were the determinative coercive factors in that case. "The youth of the petitioner, the long detention, the failure to send for his parents, the failure immediately to bring him before the judge of the Juvenile Court, the failure to see to it that he had the advice of a lawyer or a friend—all these combine to make us conclude that the formal confession on which this conviction may have rested [citation] was obtained in violation of due process." (*Id.* at p. 55.) Thus, *Gallegos* does not support I.S.'s voluntariness argument because it is so factually distinct from the case before us, and I.S.'s attempt to derive a general rule from the high court's opinion is unavailing.

I.S. also places heavy reliance on *In re T.F.* (2017) 16 Cal.App.5th 202, and asserts "the circumstances of [I.S.'s] interrogation were at least as coercive as the circumstances" in that case. Not so. Indeed, the circumstances of that case are again qualitatively distinct from the case before us.

27

In *In re T.F.*, the appellate court held that a minor's confession was involuntary where the minor had a documented intellectual disability, "had been interrogated in a small room at his school by two armed officers" (*In re T.F., supra,* 16 Cal.App.5th at p. 221) for nearly an hour without being given a *Miranda* warning. During the interrogation he denied the crime "at least 23 times" (*id.* at p. 208, fn. 8), was "very emotional" (*id.* at p. 209), "sobbed uncontrollably" (*id.* at p. 221), and ultimately confessed. Officers then handcuffed the minor, placed him under arrest, and in a "rapid recitation" (*id.* at p. 209) gave the *Miranda* warning, during which officers did not take the time to determine whether the minor understood all of his rights. Officers then subjected the minor to another "accusatory interrogation" at the police station that was "dominating, unyielding, and intimidating" (*id.* at p. 218). There is no comparison between the instant case and *In re T.F.*[11]

Here, while I.S. was at the police department, Nelson was never accusatory nor coercive. They talked about I.S.'s school, his plans for the summer, and his family, but they did not discuss the stabbing. Once at the station, Nelson told I.S. he was "still just being detained," and that "[j]ust because you're here, it doesn't mean you're under arrest; right?" I.S. replied, "Oh, yeah." Nelson agreed to get I.S. some water, and they continued a casual conversation, with Nelson again asking I.S. about his parents, cars,

---

[11] I.S. points out the police failed to comply with Welfare and Institutions Code section 627, which requires officers to inform an in-custody minor of his right to make two telephone calls; although he acknowledges its inapplicability. Indeed, "the bare violation of [Welf. & Inst. Code] section 627" does not provide for "exclusion as a remedy." (*Lessie, supra,* 47 Cal.4th at p. 1170.) He also cites Welfare and Institutions Code section 625.6, a statute enacted *after* I.S.'s interrogation in this case, which now provides that "[p]rior to a custodial interrogation, and before the waiver of any *Miranda* rights," minors under the age of 17 "shall consult with legal counsel. . . ." (Welf. & Inst. Code, § 625.6, subd. (a).) It too is irrelevant because "[s]ection 625.6 does not authorize a court to exercise its discretion to exclude statements if those statements are admissible under federal law." (*In re Anthony L., supra*, 43 Cal.App.5th at p. 450.) "[T]he proper inquiry remains not whether officers complied with the state statute, but whether federal law compels exclusion of the minor's statements." (*Ibid*.)

28

television, and about I.S.'s school and social life.[12] He explained: "When we got back to the station we had a lot of conversation, a lot of time to sit around and talk and it had nothing to do with this case. We talk[ed] about school and things like that. I wasn't trying to dig or get into – that was just conversation we were having." At one point, I.S. asked Nelson, "What does detained mean?" Nelson explained: "It means you're not under arrest. You're just not free to leave until we figure out what's going on with this. Whatever happened at your house. I don't know. I wasn't there."

Nelson observed that "[b]ased on [I.S.'s] demeanor, body language and answers to [Nelson's] questions," he had no "doubt about [I.S.'s] willingness to speak to [Nelson] about the incident," or to accompany Nelson to the police department, and stated I.S. was cooperative during their entire encounter. The juvenile court "found Corporal Nelson to be a very credible, frank and straightforward witness," and we find nothing in the record to indicate otherwise.

When detectives finally learned I.S.'s mother had died, Nelson was instructed to formally arrest I.S. and advise him of his *Miranda* rights. And as discussed above, he did so fully, and I.S. affirmatively acknowledged he understood his rights.

Similarly, during the interview itself, the detectives' demeanor and questions were unlike that seen in *In re T.F.* None of the circumstances in this case show I.S. was induced to give a false confession or that his will was overborne through aggressive and suggestive tactics. Unlike the minor in *In re T.F.*, I.S. had been read his *Miranda* rights and was reminded of them a second time. There was strong independent evidence of I.S.'s culpability for the stabbing, and the detectives did not forcefully insist on I.S.'s guilt in the face of persistent denials. (Compare *In re Elias V., supra,* 237

---

[12] Nelson admitted that establishing a friendly relationship with a suspect is an often-used investigatory technique, but he also insisted: "I really developed a rapport with I.S. And if he was feeling bad, I was there to talk to him. I wasn't there just to be the bad guy."

Cal.App.4th at p. 600 ["The voluntariness of inculpatory statements made during an interrogation conducted on the basis of no more than the interrogator's 'speculative, intuitive, and risky guess' that the subject is guilty warrants particularly careful judicial scrutiny"]; *id.* at pp. 591-592 ["Corroboration is '[t]he ultimate test of the trustworthiness of a confession'"].)

Notably, I.S. initially lied to the detectives, telling them he was outside working on his scooter, heard a scream, walked into the house, saw blood everywhere, and then fled. I.S.'s initial false story, designed to mislead detectives, suggested he was in full control of what information he wanted to provide. "[F]ar from reflecting a will overborne by official coercion," I.S.'s initial false account "suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58.)

Throughout the interview, the detectives' tone and demeanor was calm and was never inappropriate. No threats or promises were made, deception or trickery used, and nothing indicates I.S. was coerced in any manner. Ultimately, I.S. admitted what he had done, and his statements to detectives generally were consistent with his testimony— and defense— at trial. "[T]he police took care to inform [I.S.] of his rights and to ensure that he understood them. The officers did not intimidate or threaten [I.S.] in any way. Their questioning was restrained and free from the abuses that so concerned the Court in *Miranda*. [Citation.] The police did indeed indicate that a cooperative attitude would be to [I.S.'s] benefit, but their remarks in this regard were far from threatening or coercive." (*Fare v. Michael C., supra,* 442 U.S. at p. 727.)

In sum, none of the investigatory techniques the police used in this case were "of a type reasonably likely to procure an untrue statement" (*People v. Farnam* (2002) 28 Cal.4th 107, 182), and the record reflects I.S.'s will was not "'overborne at the time he confessed.'" (*People v. Smith* (2007) 40 Cal.4th 483, 501). The prosecution met its burden of showing by a preponderance of the evidence that I.S.'s post-*Miranda*

30

statements were freely and voluntarily given, were not the product of police coercion, and the juvenile court therefore properly admitted them.

III

DISPOSITION

The judgment is affirmed.

ARONSON, J.

WE CONCUR:


MOORE, ACTING P.J.


THOMPSON, J.

31